United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARTI RAMANA,<br>Plaintiff,<br>v.<br>WELLS FARGO BANK, N.A.,<br>Defendant. | Case No. 26-cv-02261-PCP<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 10 |

Plaintiff Aarti Ramana sues her bank, defendant Wells Fargo Bank, N.A. (Wells Fargo), for violating the Electronic Funds Transfer Act (EFTA). Ramana alleges that in December 2025, third-party fraudsters posed as agents of Wells Fargo and the FBI, called her, and tricked her into going to Wells Fargo branches and withdrawing money from her checking account. Over three incidents, Ramana lost $110,000. Ramana was fooled in part because the fraudsters told her that they, purportedly FBI agents, had put FBI "investigative funds" into her checking account to help track down instances of embezzlement at Northern California Wells Fargo branches. In actuality, the fraudsters had merely transferred Ramana's own money from her savings to her checking account. Because the fraudsters already had information about Ramana's account, Ramana thought they were legitimate. After Ramana learned she had been deceived, Ramana sued Wells Fargo under the EFTA. Wells Fargo now moves to dismiss Ramana's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Wells Fargo's motion to dismiss is denied.

**BACKGROUND**

Ramana is a Santa Clara resident who had a savings and checking account with Wells Fargo.[1] Complaint ¶¶ 11, 17. In December 2025, Ramana received a call from someone named Alexander who claimed to be a representative of Wells Fargo's Fraud Department. Complaint ¶ 21. Alexander said he was investigating a $900 charge in Florida and asked Ramana if it was legitimate. Complaint ¶ 21. She said it was not. Alexander also asked to confirm if a $12,000 transfer from Ramana's checking to savings account was legitimate, and she said it was. Complaint ¶ 21. Because Alexander referred to the $12,000 transfer, Ramana believed that he was from Wells Fargo. Complaint ¶ 22.

Alexander then told Ramana that there was an FBI embezzlement investigation into Wells Fargo branches in Northern California and asked if she wanted to participate. Complaint ¶ 23. Ramana agreed. Alexander transferred Ramana to someone who called himself Brandon Stewart, who purported to be an FBI agent, and told her that her account had been "restricted for security reasons." Complaint ¶¶ 26, 29. Stewart told Ramana to drive to the Wells Fargo Branch on El Camino Real in Sunnyvale, California. Complaint ¶ 29. Ramana went to the ATM at her branch and found that her account was indeed "flagged as restricted and she was unable to withdraw money from the ATM." Complaint ¶ 30.

Stewart told Ramana that the FBI put $64,000 of "investigative funds" into her checking account. Complaint ¶ 31. In actuality, the fraudsters had "transferred the $64,000 from Plaintiff's own savings account into her checking account without her authorization." Complaint ¶ 31. Ramana was then told to withdraw cash at bank teller windows at three different Wells Fargo branches while wearing AirPods keeping her in telephonic contact with the fraudsters. Complaint ¶ 32, 34. One branch did not allow plaintiff to withdraw money, but two did. Complaint ¶ 32. In total, Ramana withdrew $40,000 in cash on December 3, 2025. Complaint ¶ 33.

Ramana then met with someone purporting to be a "Supervisory FBI Agent" called "Agent Ethan Carter." Complaint ¶ 35. She put the cash in a plastic bag and put the bag in the back of a

[1] For the purposes of defendant Rule 12(b)(6) motion, the Court assumes the truth of the facts alleged in plaintiff's complaint.

black van. Complaint ¶¶ 35, 36.

On December 4, 2025, fraudsters transferred $16,000 from Ramana's savings account to her checking account. Complaint ¶ 38. On December 8, 2025, fraudsters transferred $45,000 from Ramana's savings to checking account. Complaint ¶ 39. In total, Ramana alleges that the fraudsters transferred $125,000 from her savings account to her checking account and that she withdrew $110,000 in cash and gave it to the fraudsters. Complaint ¶¶ 40, 41.

On December 11, 2025, Ramana became suspicious that she was a victim of fraud because she could no longer contact the purported FBI agents. Complaint ¶ 42. She visited a Wells Fargo branch and discussed what happened with a bank employee who helped her file a fraud claim. Complaint ¶ 43. On January 6, 2026, Ramana filed an FBI Internet Crime Complaint, and on January 13, 2026, she filed a Consumer Complaint Against a Business/Company with the California Attorney General. Complaint ¶ 45. On January 14, 2026, Ramana filed a written dispute with Wells Fargo. On February 9, 2026, Wells Fargo sent Ramana a letter acknowledging that the $64,000 and $16,000 transfers were unauthorized but stating that they could not refund the withdrawals because they were done in person. Complaint ¶ 47. The letter did not refer to the $45,000 transfer.

Ramana's complaint alleges that Wells Fargo violated the Electronic Funds Transfer Act, specifically 15 U.S.C. § 1693f and § 1693g. Ramana requests actual, treble, statutory, and punitive damages as well as costs and fees and any other just and proper relief. Complaint at 10.

**LEGAL STANDARDS**

The Federal Rules require a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If the complaint does not do so, the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a

plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## ANALYSIS

Wells Fargo moves to dismiss Ramana's complaint for failure to state a claim. In her opposition to the motion, Ramana clarifies that she alleges a violation of the EFTA based not on her in-person cash withdrawals but only on the basis of the intrabank transfers between her savings and checking accounts. Opposition at 1. As a result, the only issue before the Court is whether Ramana's complaint states a claim for a violation of 15 U.S.C. § 1693a(12) based on the $125,000 in intrabank transfers.

An "unauthorized electronic fund transfer" under the EFTA "means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12). There are thus two conditions for an "unauthorized electronic fund transfer": (1) the transfer must be directed without authorization by someone other than the consumer-victim, and (2) the transfer provide no benefit to the consumer.

The first condition is met for the intrabank transfers here because Ramana alleges that the perpetrators of fraud initiated the transfers of Ramana's funds from her savings account to her checking account. Complaint ¶ 30. Wells Fargo argues, however, that the second condition is not satisfied. It contends that Ramana received *some* benefit from the savings-to checking transfers because, "[a]t the moment Plaintiff received the cash from the Wells Fargo tellers, the benefit of

each intrabank transfer was fully and tangibly realized." Motion to Dismiss at 8 ("Plaintiff received a direct benefit in the form of credits to her checking account, which she then personally converted into cash that she physically possessed.").

The Court is not convinced. Rather than conferring a benefit on Ramana, the intrabank transfers were a source of harm to her because they facilitated her defrauding. The transfers enabled the fraudsters to represent that certain FBI funds had been placed into her checking account as part of their embezzlement investigation and, in combination with other misrepresentations, led her to believe that the investigation was legitimate and that she was in fact communicating with the FBI.

Wells Fargo nonetheless argues that the intrabank transfer provided Ramana with the benefit of having funds "immediately available for Plaintiff's use." MTD at 8. But at argument, counsel for Wells Fargo acknowledged that Ramana could almost certainly have withdrawn the same amount of money directly from her savings account. Such comparable liquidity suggests that the intrabank transfer did not meaningfully change Ramana's position. Further, savings accounts generally pay accountholders some interest for keeping their money in those accounts. Thus, a fair inference is that the intrabank transfers from her savings to checking accounts may have deprived her of interest she could have earned on those monies if they had remained in her savings account.

To be certain, this case is factually distinct from prior cases that have considered related EFTA issues because Ramana herself participated in the final transfer of her funds to the fraudsters. In *Moore v. JPMorgan Chase Bank, N.A.*, 2022 WL 16856105, at *1–2 (N.D. Cal. Nov. 10, 2022), for example, Judge Corley concluded that plaintiffs stated a claim under the EFTA for an unauthorized transfer from their savings account to their checking account because the transfer provided "sufficient monies in the checking account" for those fraudsters to access. "Such a consequence is a detriment, not a benefit." *Id.* at *1. Likewise, in *New York v. Citibank, N.A.*, 763 F. Supp. 3d 496 (S.D.N.Y. 2025), Judge Oetken similarly denied Citibank's motion to dismiss a similar EFTA claim, holding that "at least where a plaintiff alleges that intrabank transfers (1) were initiated by someone other than the consumer without actual authority, (2) were unknown to the consumer, and (3) facilitated a subsequent fraud, the plaintiff had adequately

United States District Court
Northern District of California

alleged the absence of 'benefit' within the meaning of U.S.C. § 1693(a)(12)." *Id*. at 525. Judge Oetken used dictionaries pre-dating EFTA's passage to define benefit as something that "improves the position of the recipient in some way." *Id.* at 524. Marshaling "the admittedly scarce case law on the question," Judge Oetken noted that the non-binding cases Citibank raised supported the understanding that "unauthorized consolidations of consumers' funds without their knowledge in order to facilitate easier and less detectable fraud[] occur[s] without any 'benefit' to the consumer." *Id.* at 525. And Judge Wang in the District of Colorado agreed that courts interpreting whether an accountholder received a "benefit" should consider the "'downstream effects of the transaction." *Wingard v. TBK Bank, SSB*, 768 F. Supp. 3d 1282, 1288 (D. Colo. 2025). In *Wingard* the parties agreed that there were unauthorized transfers from plaintiffs' savings account to their checking account and that third parties subsequently withdrew money from that checking account. *Id.* at 1286. Judge Wang agreed with Judges Corley and Oetken that the definition of "benefit" counseled consideration of "downstream effects" and concluded that the Wingard plaintiffs "plainly received no benefit from those [intrabank] transfers." *Id.* at 1288. Other cases have tended to agree that a broader inquiry into downstream effects best effectuates the EFTA's provisions. *See Aikens v. Portfolio Recovery Assocs.*, 716 Fed. Appx. 37, 40 (2d Cir. Nov. 21, 2017); *Guarnieri v. Be Money Inc.*, 2022 WL 11381916, at *5 (C.D. Cal. Oct. 17, 2022).

The Court agrees that, to achieve the EFTA's consumer protection goals of "promoting disclosure, preventing fraud, and allocating liability," *see Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002), the downstream effects of a transaction can illuminate whether a consumer benefitted from the transaction. The primary downstream effect of the unauthorized transfer between Ramana's savings and checking accounts here was to deceive Ramana as to the security of her bank account and induce her inadvertent facilitation of the theft of her money.

Wells Fargo distinguishes *Moore* and other decisions considering the EFTA from Ramana's lawsuit by arguing that, in those cases, the plaintiffs did not know that fraudsters were withdrawing money from their checking account, whereas Ramana knew that money had been transferred to her checking account and knowingly withdrew that amount from her checking

account herself. As Wells Fargo notes, "In each of those cases, the consumer was entirely unaware of the intrabank transfers, did not participate in any subsequent transaction that caused the loss, and never personally received or used the transferred funds." MTD at 9; *see also Moore*, 2022 WL 16856105, at *1; *Wingard*, 768 F. Supp. 3d at 1288; *Citibank*, 763 F. Supp. 3d at 504.

Wells Fargo is certainly right that prior authorities are distinguishable on this basis. But the EFTA's text requires only that the accountholder receive "no benefit" from an unauthorized transfer. 15 U.S.C. § 1693. The fact that Ramana's ultimate withdrawal was voluntary does not suggest that Ramana benefitted from the unauthorized intrabank transfer. To the contrary, as noted already, that transfer played a crucial role in enabling the fraudsters' deception. Declaring that transfer to have constituted a benefit to Ramana would stretch the relevant statutory language beyond all reasonable bounds.[2]

**CONCLUSION**

Because the Court cannot conclude that Ramana received any benefit from the unauthorized intrabank transfers at issue here, Wells Fargo's motion to dismiss is denied.

**IT IS SO ORDERED.**

Dated: September 14, 2026

P. Casey Pitts
United States District Judge

[2] Wells Fargo argues that Ramana seeks a "windfall" by claiming statutory damages of $125,000 even though she only withdrew and lost $110,000. For the purposes of Wells Fargo's motion, the Court need not determine the proper measure of the damages Ramana might recover should she ultimately succeed on the merits.